**Vance L. ECKERSLEY, Appellant,**

v.

**WGAL TV, INC. and WGAL Pension Plan, Appellees.**

No. 87–5129.

United States Court of Appeals, Third Circuit.

Argued Aug. 19, 1987.

Decided Oct. 19, 1987.

Rehearing and Rehearing In Banc Denied Nov. 12, 1987.

---

Dilworth, Paxson, Kalish & Kauffman, Thomas I. Vanaskie (argued), Hourigan, Kluger, Spohrer & Quinn, P.C., William W. Warren, Scranton, Pa., for appellant.

Reavis & McGrath, K. Jane Fankhanel (argued), New York City, McNees, Wallace & Nurick, David E. Lehman, Harrisburg, Pa., for appellees.

Before GIBBONS, Chief Judge, WEIS, Circuit Judge and KELLY, District Judge.[*]

## OPINION OF THE COURT

GIBBONS, Chief Judge.

Vance L. Eckersley appeals from a summary judgment in favor of WGAL–TV, Inc. (Successor Plan Administrator) in his suit, pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act of

[*] Hon. James McGirr Kelly, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B) (1982), for the recovery of additional pension benefits. The district court held that the action of the Plan Administrator in denying Eckersley's claim was not arbitrary or capricious, and must be upheld. We reverse.

### I.

In 1961 Eckersley was employed as the station manager of a television station in New Bedford, Massachusetts. That station was acquired, in 1966, by WGAL Television, Inc. (Employer), a Pennsylvania corporation which also owned a television station in Lancaster, Pennsylvania. The Employer continued Eckersley's services. Effective January 1, 1975, Eckersley's compensation was governed by a contract under which he was paid an annual base salary and a bonus equal to 3% of after-tax net profits earned by the New Bedford station, plus a Christmas bonus equal to his average weekly salary for the year in question. The share of profits was paid after the close of each year.

The Employer also had a pension plan under which, commencing at age 65, plan participants would be paid benefits based solely on an employee's "final average earnings." "Final average earnings" is defined in the plan as "the average of ... total nondeferred annual earnings from the Employer during the final five consecutive complete calendar years of [the employee's] service." The Employer was the initial plan administrator.

On August 15, 1987, the Employer sold the assets of the New Bedford television station for $16,195,500 to a Delaware corporation wholly owned by the Pulitzer Publishing Company. Simultaneously the Employer sold the assets of its Lancaster, Pennsylvania television station to WGAL–TV Inc., a separate, wholly-owned Pulitzer Publishing Company subsidiary. These sales marked the end of Eckersley's employment as manager of the New Bedford station. Following the sales of the two stations, WGAL–TV Inc. became the Successor Plan Administrator of the Employer's pension plan.

The Employer paid Eckersley 3% of the net after-tax profits of the New Bedford station for the first seven months of 1979. The Employer did not, however, disclose to Eckersley the amount of the net profit on the sale of the station's assets, or pay him any part of that profit. In December, 1979, Eckersley requested that the Employer adhere to its contractual obligation by including in his bonus calculation 3% of the net after-tax profits on the sale of its assets. The Employer refused.

Because he had reached the age of 65, Eckersley sought a normal pension. The Successor Plan Administrator initially calculated Eckersley's average total nondeferred annual earnings for the years 1975 through 1979 by including his basic salary and all profit-sharing monies he had actually received. The Successor Plan Administrator did not include any amount that Eckersley claimed as his share of the profits on the sale of the New Bedford station assets. That computation resulted in a monthly benefit of $512.49. On August 4, 1980 Eckersley's counsel transmitted to the Successor Plan Administrator a request for a formal review of the computation, asserting that 3% of the profits from the sale of assets should have been included. By then, Eckersley had commenced suit against the Employer for additional compensation, and the Substitute Plan Administrator responded to the effect that since the claim for additional compensation was in litigation the review of the computation of pension benefits was premature.

Eckersley's suit against the Employer sought only the additional compensation he claimed under his employment contract. He alleged that "[the Employer's] failure to pay plaintiff 3% of the net profits of [the New Bedford station] for the month of August, 1979, constitutes a breach of the written bonus plan." Because he was not informed of the amount of profit realized on the sale of assets, his initial demand was for 3% of the sales price. After discovery, Eckersley's suit against the Employer was settled for $200,000. As a part of the settlement, Eckersley signed a release in favor of the Employer "its shareholders,

directors, officers, agents and employees and their heirs and assigns."[1] The release states that it is a full and complete settlement of the liability claimed and denied in the lawsuit. The Successor Plan Administrator was not a party to the lawsuit, however, and no reference appears, either in the complaint against the Employer or in the release, to Eckersley's still pending claim for additional pension benefits. The Employer reported the $200,000 payment for federal income tax purposes as "Court-ordered payment to V. Eckersley as compensation re: sale of station WTEV–TV."

Following the settlement with the Employer, Eckersley's counsel, referring to the request for formal review transmitted to the Successor Plan Administrator on August 4, 1980, requested a computation of additional "retroactive and future benefits to which Mr. Eckersley is now entitled as a result of the inclusion of the additional compensation of $200,000 for the year 1979." Letter from Myers dated August 3, 1984. That request was referred to the Successor Plan Administrator's business manager, actuary, and attorneys. On May 30, 1985, the Successor Plan Administrator rejected the request for the following reasons:

1. Benefits under the Plan are computed on the basis of "Final average earnings." ... "Final average earnings" as defined in Section I of the Plan consist

solely of "nondeferred annual earnings from the Employer during the final five consecutive complete calendar years of his Service" and do not encompass the amount received by Mr. Eckersley in settlement of litigation between him and WGAL Television, Inc.

2. [I]n settling his litigation with WGAL Television, Inc., Mr. Eckersley executed a release of all possible claims against WGAL Television, Inc. and its heirs and assigns. We believe that this release serves to release both WGAL Television, Inc. and WGAL–TV, Inc. as well as the Plan from Mr. Eckersley's claim for additional benefits under the Plan.

Letter from Ridgeway dated May 30, 1985. Thus the pension claim was rejected on the alternative, or perhaps cumulative, theories that (1) the $200,000 was not earnings, and (2) the release benefitted the plan as well as the Employer. The Successor Plan Administrator did not mention that, for tax purposes, the Employer treated the $200,-000 payment as compensation. This ERISA action followed the rejection of the request for recalculation of benefits.

## II.

Following discovery, the parties entered into a comprehensive stipulation of material facts.[2] Both sides moved for summary

---

1. The full text of the release is as follows:

*RELEASE*

KNOW ALL MEN BY THESE PRESENTS, That I, VANCE L. ECKERSLEY, for and in consideration of the payment of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, do hereby remise, release and forever discharge WGAL TELEVISION, INC., its shareholders, directors, officers, agents and employees, and their heirs and assigns, from any and all claims, demands, damages, liability, actions, causes of action or suits of any kind or nature whatsoever and including, but not limited to, any and all claims which I have made or could have made in a suit now pending in the United States District Court for the Eastern District of Pennsylvania, as of Civil Action No. 80–2749, which suit it is agreed shall be dismissed with prejudice.

In making this settlement, it is my intention that this release shall not be subject to any claim of mistake of fact and that it expresses a

FULL AND COMPLETE SETTLEMENT of a liability claimed and denied, and regardless of the adequacy or inadequacy of the amount paid, it is intended to avoid litigation and to be final and complete.

I further agree that I have read this release and that there is absolutely no agreement or reservation not clearly expressed herein and that the sum of money stated herein is all that I am ever to receive and is received with full knowledge that it covers all possible claims.

IN WITNESS WHEREOF, and intending to be legally bound hereby, I have hereunto set my hand and seal this 19th day of June, 1984.

———————————/s/ *Vance L. Eckersley* (Seal)

Signed, sealed and delivered in the presence of: /s/ *Willard L. Dougherty*

2. It was stipulated that if the sum of $200,000 received in settlement of the action under the Bonus Plan is included in Eckersley's 1979 earnings, Eckersley is entitled to an additional monthly retirement benefit of $518.62, retroac-

judgment. Eckersley relied upon the stipulated facts and a deposition of Willis W. Shack, former president of the Employer. The district court granted the motion of the Successor Plan Administrator. Without reaching the question of the effect of the release, the court ruled that the action of the Successor Plan Administrator in refusing to treat the $200,000 as compensation was made after consideration of all relevant factors, and should not be set aside.[3]

### III.

On appeal the Successor Plan Administrator defends the district court ruling that the $200,000 was not earnings, and also relies on the release as an alternative ground for affirming the summary judgment. Thus we must address both grounds. Since we review a summary judgment, our review is plenary and we must apply the same test the district court should have used. *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

### A.

The Successor Plan Administrator urges that in reviewing its decision as to what payments should be included for purposes of calculating benefits, the courts are confined to an examination of whether the decision was arbitrary or capricious. *See Tanzillo v. Local Union 617 Int'l Bhd of Teamsters*, 769 F.2d 140, 147 (3d Cir. 1985); *Gaines v. Amalgamated Ins. Fund*, 753 F.2d 288, 289 (3d Cir.1985); *Struble v. New Jersey Brewery Employees Welfare Trust Fund*, 732 F.2d 325, 333 (3d Cir.1984). Our recent opinion in *Bruch v. Firestone Tire and Rubber Company*, 828 F.2d 134 (3d Cir.1987), establishes that questions of the scope of judicial review over decisions of plan administrators are a good deal more complex, however, than the "arbitrary or capricious" formulation suggests. Be that as it may, no matter how narrow the scope of review we apply, we cannot uphold the ruling that the $200,000 paid in settlement of Eckersley's suit against the Employer was not compensation.

It is undisputed that all profit-sharing payments received by Eckersley for the years 1975 through 1979 were included in the initial calculation of his retirement benefits in early 1980. This suggests that, had the Employer initially paid the additional share of profits claimed by Eckersley, it would have been included when his pension benefits were calculated. The Successor Plan Administrator contends that because the $200,000 settlement was not received until 1984, four years after his employment ended and his pension eligibility commenced, it should be disregarded. The mere fact, however, that the amount to which Eckersley was entitled was not established at the time his pension was originally computed is not sufficient to exclude the sum he actually received in 1984. *Cf. Harden v. Warner Amex Cable Communications, Inc.*, 642 F.Supp. 1080, 1096 (S.D.N.Y.1986) (a mutually agreeable termination does not deprive an employee of accrued compensation where the precise amount due cannot be determined until after the employee's termination date). Any other rule would result in an incentive for

---

tive to January 1, 1980, and payable for the remainder of his life and the life of his wife, if she survives him.

**3.** The court reasoned:

In this case, relying upon *Gallagher [v. Chemetron Corp. Retirement Plan*, 618 F.Supp. 1480 (W.D.Pa.1985), *aff'd mem.*, 791 F.2d 917 (3d Cir.1986) ], we hold that the quid pro quo for the $200,000 settlement payment was not the plaintiff's personal services to the television station. Rather, the quid pro quo was the plaintiff's agreement to dismiss his action against WGAL Television, Inc. "regardless of the adequacy or inadequacy of the amount paid." We therefore believe that the defendants' refusal to include the settlement payment as part of the plaintiff's earnings was made after consideration of all the relevant factors, to wit: (1) the language of the pension provisions; (2) the circumstances under which the settlement occurred, i.e., no acknowledgment that the sale proceeds were net profit; (3) the general release given after the settlement, and the lack of any characterization in any document associated with the litigation that the payment was salary or bonus for services.

employers, who are frequently also plan administrators, to force employees to resort to suit: By simply denying an employee's claim to compensation and thus delaying the establishment of the right to compensation, an employer/plan administrator would be able to exclude that compensation from the pension calculation.

■ The Successor Plan Administrator also urges that the $200,000 payment was not compensation due under his bonus contract, but rather nothing more than a payment for dismissing his lawsuit. This contention cannot be accepted. While the immediate occasion for the payment was the settlement of the lawsuit, the only reason for that suit was Eckersley's claim that under his compensation contract he was entitled to 3% of the entire annual profits derived by his employer from the station he managed. Had the suit gone to judgment and the payment been made in satisfaction of that judgment, the payment would be treated as compensation. *See Kulchin v. Spear Box Co. Retirement Plan*, 451 F.Supp. 306, 312 (S.D.N.Y.1978). Had the Employer in 1980 paid 3% of the net after-tax profits from the sale of assets, it could hardly be argued that the payment was any different from the remainder of the compensation based on profits. There was no basis whatever for Eckersley's claim other than his compensation contract. If we were to approve the rulings of the Successor Plan Administrator and the district court that a payment in settlement of a lawsuit to enforce a claim for compensation should be treated differently than a payment on the claim, we would discourage such settlements and encourage their litigation to judgment. Such a result would be inconsistent with the strong public policy favoring pre-judgment settlements of lawsuits.

In upholding the decision of the Successor Plan Administrator, the district court relied on the opinion in *Gallagher v. Chemetron Corp. Retirement Plan*, 618 F.Supp. 1480 (W.D.Pa.1985), *aff'd mem.*, 791 F.2d 917 (3d Cir.1986). The district court opinion in *Gallagher* obviously does not control in this court and the affirmance without published opinion does not bind this panel. *Cf.* IOP 8(c). Moreover, *Gallagher* involved a set of circumstances entirely distinguishable from those relied on by Eckersley.

The plaintiff in *Gallagher*, as part of the negotiated agreement for the acquisition of the corporation of which he was president and chairman, agreed to *cancel* his stock opinion rights in exchange for a negotiated price that was not equivalent to market value at the time he forfeited his rights. When he retired, plaintiff sought to have included in his pension calculations the sum he received for the cancellation of his stock option rights. A stock option, of course, confers benefits only when it is exercised. *See Weir v. Anaconda Co.*, 773 F.2d 1073, 1085 (10th Cir.1985). Since it was undisputed that Gallagher never exercised his stock option rights, but instead surrendered those rights, the court concluded that "a legitimate question arises as to whether ... compensation was ever realized." *Gallagher*, 618 F.Supp. at 1482. In addition, the employer in *Gallagher* submitted evidence indicating that the agreement to cancel the stock option rights was not intended as compensation. Consequently, the court refused to include in plaintiff's pension calculations the sum he received for cancelling the stock option.

In this case, there is no issue regarding unexercised rights. In addition, and unlike Gallagher, Eckersley has produced evidence which tends to support the notion that the payment was intended as compensation. As noted above, the Employer's tax return listed the payment as compensation to Eckersley. The Successor Plan Administrator, on the other hand, produced no evidence suggesting that the $200,000 payment was intended as anything other than compensation. More fundamentally, *Gallagher* simply does not address the impact of a compromised claim for additional compensation under a salary and bonus contract.

The Successor Plan Administrator urges that it is not bound by the Employer's treatment of the payment as compensation. However, where the only basis for the

claim which was paid is a compensation contract, there is simply no rational basis on which a plan administrator can go behind the Employer's characterization of the payment. "[O]ne very important policy underlying ERISA is that employees enrolled in a benefit plan should not be deprived of compensation that they reasonably anticipate under the plan's purported coverage." *Northeast Dep't ILGWU Health & Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund,* 764 F.2d 147, 163 (3d Cir.1985). Certainly where the employer and the plan administrator are one, the employer may not, in its role as plan administrator, defeat the reasonable expectations it created in its role as employer without good reason. We see no justification for a different result simply because a new plan administrator has succeeded the employer.

The final point made by the Successor Plan Administrator in favor of its decision that the $200,000 was not compensation is that treating it as such might have an adverse effect on other plan participants. *See Struble v. New Jersey Brewery Employees Welfare Trust Fund,* 732 F.2d 325, 333 (3d Cir.1984) (need for plan to provide benefits to as many intended employees as possible while protecting financial stability of fund justifies "arbitrary or capricious" standard of review). We cannot accept this argument. First, it is not a ground upon which the Plan Administrator relied in rejecting Eckersley's claim. Second, no evidence was tendered in the summary judgment record that paying Eckersley a higher pension will unduly or improperly injure the interest of other plan participants. Thus there is no factual predicate for the argument. Finally, Eckersley, a pension plan participant, has an interest at least as valid as that of any other plan participant. Thus there is no legitimate reason for denying his valid claim for a pension fully consistent with the plan language.

We conclude, therefore, that the summary judgment against Eckersley cannot be affirmed on the first ground advanced by the Successor Plan Administrator and accepted by the district court.

### B.

Turning to the release, we note at the outset that it is not a pension plan document. Moreover, it is not a document to which the plan is a party. Thus there is no basis for an argument that in determining its effect the court owes any degree of deference to the plan administrator's interpretation of it.

We can find in the release no basis for denying Eckersley's pension benefits. The release does not refer to the plan or any pension claim. The Successor Plan Administrator is not a shareholder, director, officer, agent, employee, heir or assign of the Employer to whom the release runs. Moreover, the summary judgment record contains no extrinsic evidence that the parties to the release—the Employer and Eckersley—intended to confer a benefit on the plan, which was not a party to the lawsuit which that release settled. Eckersley never sought pension benefits in the lawsuit against the Employer, and although the Successor Plan Administrator had notice of the lawsuit and of Eckersley's pension claim, it did not seek to intervene. Lastly, there is no evidence in the summary judgment record that if Eckersley is paid a higher pension the Employer will have to contribute to it. We therefore conclude that the Successor Plan Administrator acted arbitrarily and capriciously in relying on the release as a reason for refusing to recalculate his pension.

### IV.

Neither of the grounds relied upon by the Successor Plan Administrator for denying benefits has factual or legal support. The $200,000 payment was earnings under a compensation contract, and thus earnings within the definition of earnings in the plan. The release of the Employer did not benefit the Successor Plan Administrator or the plan. No other basis for denying Eckersley's recalculated pension benefits were advanced in opposition to his motion for summary judgment, and the amount of the increased pension has been stipulated. The district court erred in granting the summary judgment motion of the Succes-

sor Plan Administrator, and in denying Eckersley's summary judgment motion. The judgment appealed from will therefore be reversed and the case remanded for the entry of judgment in Eckersley's favor.